No. 9.—UEL L. WRIGHT, ISAAC SCOTT and others, plaintiffs in error, *vs.* THE CENTRAL RAIL-ROAD & BANKING COMPANY, defendant in error.

[1.] When the question is one of diligence, between a bank and its agent, it is not competent for the latter to protect himself, by proving the custom of another bank, in providing its agents with suitable buildings and iron safes, for the purpose of keeping securely the money of the principal.

[2.] It is competent for an agent, who has been robbed of the money of his principal, to show that banks and other custodions of money, look to their vaults and safes for security, and not the outside fastenings of the building in which it is kept.

[3.] An agent for hire, without specific instructions, is bound to observe all the precautions ordinarily pursued in relation to the particular business in which he is employed, and according to the usage of the place and the circumstances of the times within which the business is transacted.

[4.] It is the privilege, though not, necessarily, the duty of the Court to sum up the evidence in conclusion.

[5.] It is not necessary, in summing up, that any material fact should be stated: still, it is not just to present the proof, prominently, on one side, and omit, entirely, the countervailing evidence on the other.

Debt, in Bibb Superior Court.    Tried before Judge POWERS, November Term, 1853.

This was an action of debt, brought by the Central Rail-road and Banking Company, against Uel Wright and others, on the following bond:

"GEORGIA—DEKALB COUNTY:

Know all men by these presents, that we, U. L. Wright, Isaac

Wright *et al. vs.* The Central R. R. & B'k'g Co.

Scott, James D. Carhart, William B. Carhart, James T. Doane, James Robinson, Terrence Doonan, Joseph Thompson and William B. Davis, are held and firmly bound unto the Central Rail-road & Banking Company of Georgia, in the full sum of Ten Thousand Dollars, to be paid to the said Company or its assigns; for which payment we bind ourselves, our heirs, exectors and administrators, jointly and severally, firmly by these presents, sealed with our seals and signed with our hands, this 22d day of November, 1850. Whereas, the above bound U. L. Wright has been appointed to the office of agent of the said, the Central Rail-road & Banking Company of Georgia, at Atlanta. Now, the condition of the above bond or obligation is such, that if the said U. L. Wright shall well and truly execute, and faithfully discharge the duties required of him in said office, and all other duties required of him in the business of the said, The Central Rail-road and Banking Company of Georgia, and in all things shall well and faithfully behave and conduct himself and discharge the trust reposed in him, then this obligation to be void."

U. L. WRIGHT, [L. S.]
ISAAC SCOTT, [L. S.]
JAMES D. CARHART, [L. S.]
WILLIAM B. CARHART, [L. S.]
JAMES T. DOANE, [L. S.]
JAMES ROBINSON, [L. S.]
TERRENCE DOONAN, [L. S.]
JOSEPH THOMPSON, [L. S.]
WM. B. DAVIS, [L. S.]

The declaration alleged "that on the 16th day of March, 1852, there came into the hands of the said Wright, as such agent, the sum of Twenty Thousand Dollars, for which the said Wright had failed and refused to render a true and faithful account, and to pay over the same to the plaintiff."

To this action, the defendants pleaded specially, "that on the 16th day of March, 1852, $18.121 76 of money of said plaintiff, was, by some unknown person, feloniously and privately stolen, taken and carried away, without the knowledge

of said U. L. Wright, and without any negligence or careless-
ness on the part of said Wright, said sum of money, on the day
and year aforesaid, having been stolen from a large iron safe
situate in the back room of the business house of the said
Wright, in the City of Atlanta," &c.

On the trial, plaintiff read in evidence the bond of Wright
and his securities, and proved by Richard W. Adams, "that
on the 16th day of March, 1852, the amount of money in the
hands of Wright, as the agent of plaintiff, was $16.387 76;
which sum he, the said Wright, had never paid over to
plaintiff; that Wright received, as a salary for his services,
$50 per month. The principal business of Wright was to
discount bills on Savannah, predicated on shipments of cotton
and produce, to collect papers, circulate bills, &c. as bank
agent," and closed.

The defendant opened his defence, and it appeared in evi-
dence, that the money was kept in an iron safe, situate in the
back room of a business house in the City of Atlanta, which
was occupied as a bed-room, and in which two persons slept
every night. The shutter of one of the windows to said room,
had been off for some time, and the glass window was fastened
down by a nail. On the night the robbery is alleged to have
been committed, the persons who usually slept in the room,
were at a ball; and that between the hours of 9 and 10 o'clock,
Wright went to the ball and gave the key of the house to one
of them. It also appeared in evidence, that a noise was heard
by Daniel J. Owens, between the hours aforesaid on that night,
which he, Owens, thought was caused by a cat breaking a tum-
bler in his own house, which noise was in the direction of the win-
dow of Wright's room, which had no shutter, the said window being
not more than fifteen feet from Owens, who was in his own
room at the time. A pane of glass in the window, was broken
out, and the iron safe left open, and had the appearance of be-
ing forced open. Wright had been seen to enter through this
window by Owens once, before the night of the robbery, alleg-
ing that the young men had the key and were absent.

It was also in evidence, "that the place where Wright kept

his money, was such as is usual for merchants or bank agents to have in Atlanta. Wright lost his own money, that was in the safe at the time; that R. R. Cuyler, the President of the Bank, had been in the room occupied by Wright as agent, and made no complaint as to the safety or insecurity of the place. For three months after the robbery, the Bank continued Wright as their agent in the transaction of business, by sending him papers, &c. for collection, &c. and continued his salary up to the 26th day of June, 1852."

Defendants introduced J. C. Plant, and proposed to prove by him "that he was agent of the Marine & Fire Insurance Bank, and that it was the custom of that Bank to furnish strong and substantial safes to their agencies, for the safe-keeping of their money", which, on motion, the Court rejected, and Counsel for defendants excepted.

Defendants then proposed to prove by Plant, "that banks do not look to outer doors and windows for security to their funds, monies, papers, &c. but to their vaults and strong safes", which, being objected to, the Court refused, and Counsel for defendants excepted.

Much other evidence was adduced, which it is unnecessary, here, to set forth.

Counsel for defendants requested the Court to charge the Jury, "that a person standing in the relation which defendant occupied to the plaintiff, is not liable, at all events, for the safe custody of the money entrusted to him. He is not liable for extraordinary diligence, but he is bound for ordinary diligence only; that if the Jury believed that the evidence established that Wright was a man of ordinary prudence, in the manage-ment of his own affairs, and he took the same care of plaintiff's money as he did of his own, he is not liable in law." The Court refused to charge exactly as requested, but did charge the Jury, that Wright was bound to take the same care of plaintiff's money as men of ordinary prudence would take of their own. He was bound for ordinary diligence only; but the question for the Jury to decide was, did he keep this money

xvi–6

with common prudence or ordinary diligence? not whether he was a man of ordinary prudence in the management of his affairs, generally—and his own money was with plaintiff's, and taken at the same time. A man of well established prudence may, in a particular instance perhaps, be guilty of the grossest negligence; and if loss resulted to one trusting him as plaintiff did Wright, by reason of his negligence, he would be liable. The Jury will therefore look to all the facts and circumstances, as described in evidence; and if, from the examination, are convinced that Wright, on this occasion, whatever may be his general character, acted negligently, without common prudence or care—in that event, in the opinion of the Court, he and his securities are liable, in law, to the plaintiff, for the damage sustained. It is therefore proper that the Jury should consider every fact in evidence, to arrive at a satisfactory conclusion as to the character of the diligence and prudence observed; and they may consider that a shutter had been allowed to remain from the window; the window sash was left in a condition, that the nail, if any, which fastened it down, could have been drawn from the outside, with an instrument or thumb and finger; that the young men who slept in the room where the safe was kept, were out at a party, the night of the alleged robbery, with the knowledge of defendant; that the chest and place were not suitable for keeping so large an amount of money. These facts had been alleged and insisted on in argument—did they exist? If the Jury believe they did, let them say, from the facts, do they show ordinary diligence on the part of Wright, under all the circumstances, as detailed? If they do, then he is not liable; if they do not, then Wright is liable to plaintiff." The Court further charged the Jury, "that if they believed from the evidence, that Wright had been guilty of criminal conduct; that is, in being, himself, the robber, in that event, there was an end to the inquiry; for the defendant and his securities would, unquestionably, be liable to plaintiff." To which charges and refusal to charge by the Court, Counsel for defendants excepted; and upon these several exceptions, error is assigned.

McDonald and H. Warner, for plaintiff in error.

Poe, Nisbet & Poe, for defendant in error.

*By the Court.*—Lumpkin, J. delivering the opinion.

[1.] Did the Court err in rejecting the testimony of Plant? It was proposed to prove two facts by this witness—First, That he was the agent of the Marine Insurance Bank, and that it was the custom of that Bank to furnish its agents with a suitable place and iron-safes for keeping, securely, the funds in their hands; and Secondly, that banks and other custodions of money, do not look to doors and windows for protection, but to their vaults and strong boxes.

We see no error in the Court, in refusing to admit that portion of the testimony, which went to establish the usage of the particular Bank for which the witness was employed. It does not appear, however, that Mr. Wright ever applied to his principal, to be provided with additional means of security for keeping their cash, or complained that they had not been furnished. On the contrary, the proof is, that he undertook, for the consideration paid him, and the collateral benefits resulting from his agency, to keep the money and effects of the Central Railroad & Banking Co. by such means as he, himself, could command.

[2.] As to so much of Plant's evidence as seeks to show the opinion entertained, by banks, as to the relative value or strength of outside fastenings, and vaults, and safes, we do not see why it should have been ruled out as incompetent. The proof was certainly pertinent to the issue : as to its weight, we express no opinion.

[3.] We see no error in the refusal, by the Court, to give the special instructions asked, namely : that if the Jury believed that Wright was a man of ordinary diligence, and kept the plaintiff's money with the same care that he did his own, they could not find against the defendants.

This is not the law of this case; for, as was very properly remarked by the presiding Judge, a man, even of extraordinary prudence, might be guilty of gross negligence, in a particular instance, both as it respects his own money and that of other people. The rule to be deduced from a careful examination of all the authorities upon this subject, seems to be this: that an agent for hire, and without specific instructions, is bound to observe all the precautions ordinarily pursued, in relation to the particular business in which he is employed; and according to the usage of the place, and the circumstances of the times within which the business is transacted.

What might be extraordinary care at one place and under one set of circumstances, might amount only to ordinary diligence, at other places and under a different state of facts. While burglaries were nightly perpetrated, or attempted, in Augusta, on a recent occasion, surely *ordinary* diligence would demand a degree of watchfulness and care, which would not be thought of under other circumstances. So, when Roberts and his gang were at large and hovering around a place, what man of common prudence would not guard his own treasure, as well as that of others, with more care and caution? We use these illustrations, to make the rule which we have here prescribed, intelligible.

For the sake of convenience, we propose to transpose the third and fourth assignments, and consider the latter first.

[4.] Was the Court justified in charging the Jury, that if they should find that Wright himself was the robber, he and his securities were unquestionably liable? It is objected that there was nothing, either in the pleadings or proof, to authorize this charge. What is this case? Wright was appointed by the Central Rail-road and Banking Company, their agent at Atlanta. He gave bond, with security, conditioned that he would well and truly execute, and faithfully discharge the duties required of him in said office; and all other duties required of him, in the business of his employers. The proof was, the principal business required of Wright, was to discount

Wright *et al. vs.* The Central R. R. & B'k'g Co.

bills on Savannah, drawn on shipments of cotton and other produce; to collect papers; circulate bills, &c. as Bank Agent.

Now, the breach of the bond is not the robbery resulting from the carelessness or misconduct of the agent, but his failure or neglect to pay over some sixteen or eighteen thousand dollars of the plaintiff's money in his hands. Wright's defence is, and he files a special plea to that effect, that on the night of the 16th of March, 1852, his room, where he kept plaintiff's money, was feloniously entered, and the money was stolen from the iron chest in which it was locked up. Now, if the defendant failed to show that the money was burglariously taken, and that, too, under circumstances, which, in law, would afford him protection, he, of course, was liable for failing to account for this fund; and consequently, this charge was wholly unnecessary, so far as the rights of the plaintiff were concerned, though certainly true as an abstract proposition.

But it is insisted, that the charge was erroneous, because hypothetical—there being no proof to establish the guilt of Wright.

But it was incumbent on him to make it satisfactorily appear that some one else was guilty, even if he cannot identify the particular person: otherwise, his plea falls to the ground, and he remains liable for the acknowledged defalcation. Conceding that the window of the room was forced, and the safe entered at the time alleged, does the proof indicate the felon? Has any one been prosecuted and convicted, or even suspected of this crime? The guilty party has hitherto escaped detection. Does the evidence show that any one but Mr. Wright knew that this room would be vacated during the short interval which intervened, between the time of the delivery of the key to the clerks, and the breaking of the pane of glass in the unshuttered window, which was heard in the neighborhood? Does Mr. Wright prove an *alibi*, or any other fact which is inconsistent with his own guilt?

These remarks are elicited, not for the purpose of criminating Mr. Wright, or even insinuating that he, himself, was the author of a feigned robbery: but to show that the Court was not wholly

unwarranted by the proof, in the charge which it gave. The only doubt is, whether, if the plaintiffs put their recovery upon this ground, and not merely on the failure to account, the defendant should not have been notified by the declaration of such intention; so that he might offer rebutting testimony as to his good character, and every thing else which would establish his inno-cence.

[5.] One question more remains to be considered. In con-clusion, his Honor, the Circuit Judge, undertook to sum up the evidence. In doing so, he grouped together a few of the most prominent facts against the defendant, and charged the Jury, that if they believed them, under all the circumstances, as detailed, then they should find for the plaintiff.

It is not, necessarily, the duty of the Court to sum up in conclusion. It is the privilege of the Court to do so. Under our Statute, forbidding the Judge to intimate as to what is or is not proven, it is extremely difficult to avoid the inhibition contained in the Act. Still, it may be done, and must be done, or a new trial is the consequence. We do not say, that in summing up, every material fact must be stated. But we do say, that it is not just to present the proof prominently on one side, and omit the countervailing evidence, entirely, on the other.

And this is the defect in the charge. His Honor, in commenting on the nature of the diligence observed by the defendant, told the Jury that they might consider that a shutter had been allowed to remain from the window, the window-sash was left in a condition that the nail, *if any*, which fastened it down, could have been drawn from the outside with an instrument, or with the thumb and finger; that the young men who slept in the room where the chest was kept, were out at a party the night of the alleged robbery, with the knowledge of the defendant, Wright; and that the place and chest were not suitable for so large an amount of money.

But he omitted to remind them, at the same time, that Wright had provided a means of equal, or greater security, than was found, ordinarily, in the City of Atlanta; that he provided himself with an iron chest; that it was kept in a room where

two young gentlemen usually slept; that the sash of the window was secured by nails inside; that Wright was careful of the money entrusted to his keeping; that he deposited his own money in the same place; that for several months after the alleged robbery, plaintiffs retained Wright in their employment, and that the President of the Company, Mr. Cuyler, had been in the room and saw Wright's mode of keeping money, and made no complaint.

Upon the whole, we think it best that the cause be sent back for a re-hearing. To the plaintiffs, it is a matter of delay only, should they finally recover. To the defendant, it is a question of character, and both to him and his securities, one of pressing pecuniary importance. It should be fairly and fully heard.